STEARNS' PROPERTIES, a California Limited Partnership, Plaintiff,

v.

TRANS–WORLD HOLDING CORPORATION, a Nevada Corporation, and William Butters, Defendants.

Civ. No. LV 78–44 RDF.

United States District Court,
D. Nevada.

May 27, 1980.

Friedemann & Menke, Orange, Cal., Leland Eugene Backus, Thorndal, Gentner, Backus, Lyles & Maupin, Ltd., Las Vegas, Nev., for plaintiff.

Gary Logan, Las Vegas, Nev., for defendants.

**240**

ROGER D. FOLEY, District Judge.

This is an action for breach of contract and fraud. The plaintiff Stearns' Properties (Stearns), is a California limited partnership whose general partner, Phillip Stearns, is also a resident of California. The defendants-counter-claimants are Trans-World Holding Corporation (Trans-World), a Nevada corporation, and William Butters, a resident of Nevada. The amount in controversy exceeds $10,000. Therefore, this Court has jurisdiction by virtue of diversity of citizenship among the parties. Title 28, U.S.C., § 1332. Venue in this Court is also proper. Title 28, U.S.C., § 1391.

On January 16, 1978, Mr. Stearns and Mr. Butters began negotiations for the sale by Stearns to Trans-World of certain real property situated in Las Vegas, Nevada, together with all improvements and fixtures thereon, commonly known as the Rendezvous Hotel and Casino (Rendezvous). Mr. Butters is Chairman of the Board of Directors of Trans-World and holds a majority of the stock in that corporation.

Trans-World planned to attract people to the Rendezvous by producing television shows from the hotel-casino. An important element in the feasibility of this plan was the acquisition of a certain tract of land adjacent to the Rendezvous on which the sound stage could be constructed. These plans, including the necessity of obtaining the adjacent land, were communicated to Stearns. The adjacent property in question is owned by First Western Savings and Loan Association and, at all times relevant to this action, was the subject of a lease agreement in favor of Mobil Oil Corporation which would not expire until April 12, 1980.

During the course of the negotiations, Mr. Butters made certain representations, which may have been somewhat inflated, as to his personal net worth and that of Trans-World.

The negotiations culminated in the execution on February 1, 1978, of an agreement for the sale of the Rendezvous to Trans-World (the Agreement). The Agreement established a purchase price of $4,573,-613.66, that amount being the total of cash payments in the amount of $526,000, a promissory note in the amount $500,000 to be paid over five years and secured by a deed of trust, and the assumption of indebtedness in the amount of $3,573,613.66. Stearns also agreed to assign, and Trans-World agreed to assume, two lease contracts, one in favor of MacArthur Leasing Co. and the other in favor of Federal Leasing Corporation, for certain furniture and equipment.

Upon execution of the Agreement, and pursuant to the terms thereof, Trans-World deposited $52,000 into escrow. Escrow was expected to be closed on or before March 1, 1978, provided that all appropriate documents and funds had been deposited. Stearns agreed to pay all obligations on the property through February 28, 1978:

Paragraph 19 of the Agreement provided:

"19. *Option.* Seller shall use its best efforts to obtain an option to purchase the property described as Lots 17, 18, 19 and 20 of Block 33, Clark's Las Vegas Townsite, Clark County, Nevada. Upon receipt of said option, Seller shall promptly assign same to Buyer. The receipt of the option shall *not* be a condition precedent to the close of the Escrow."

The property described constitutes the property adjacent to the Rendezvous that Trans-World desired to acquire.

Mr. Stearns contacted the president of First Western Savings and Loan Association who informed him that, prior to the expiration of the Mobil Oil lease, there was no chance of obtaining an option on the property. No evidence suggests that Stearns' obligation under the terms of paragraph 19 required any further efforts in that regard.

On March 1, 1978, Stearns was ready, willing and able to perform its obligations under the Agreement in order to close the escrow. Trans-World did not deposit the $474,000 required by the terms of the Agreement. By amendment of the escrow instructions, the parties provided for a pos-

sible extension of the escrow period until April 1, 1978, upon certain conditions. Trans-World never satisfied the conditions for such an extension. By letter from its attorney, Thomas G. Bell, on March 3, 1978, Trans-World demanded return of the escrow deposit on the alleged ground that Stearns had defaulted on its obligations under the Agreement.

After the escrow failed to close pursuant to the Agreement with Trans-World, Stearns put the Rendezvous back on the market but did not find a buyer. Sometime in April 1978, Stearns leased the property to Big Nickel, Inc. The terms of the lease were never entered into evidence. Big Nickel, Inc., opened the Rendezvous casino in June or July of 1978, but the operation was not successful and the lease was eventually terminated. Stearns was then required to make payments on the various obligations encumbering the Rendezvous and through May 1, 1979, made undifferentiated payments totaling $618,000. In January 1980, Stearns lost the property when the holder of the first trust deed, Home Savings Association, foreclosed on the property.

MacArthur Leasing Co. has sued the plaintiff for breach of the lease agreement covering furniture and equipment. At the time of trial, that action was still pending in the Superior Court of the State of California for the County of Los Angeles. That complaint seeks compensatory damages of $622,729.11, that sum being the net amount allegedly due on the lease which called for payments totaling $766,435.81, of which $153,286.16 was actually paid, plus contractual penalties and attorneys' fees. The alleged breach of the MacArthur Leasing Co. lease occurred sometime after January 12, 1979.

Plaintiff filed this action on March 13, 1978, alleging breach of contract and fraud. The fraud claim is premised on Mr. Butters' representations as to his net worth and that of Trans-World. Stearns contends that it relied on those representations in entering into the Agreement. The complaint claimed actual damages "in an amount exceeding TEN THOUSAND DOLLARS ($10,000.00)," with the provision that "[w]hen the exact amount of damages has been ascertained, plaintiff will ask leave of Court to amend the Complaint accordingly or upon proof at the time of trial." No motion to amend the prayer for damages was made by Stearns. In its trial brief, Stearns argued that its actual damages totaled $1,026,000, being the claimed "loss of the benefit of the bargain . . . as the amount in excess of the outstanding obligations which Trans-World had agreed to pay." Plaintiff also asks punitive damages in the amount of $1,000,000 by reason of the alleged false representations.

Trans-World has interposed, by way of defense and counterclaim, an allegation of fraud in the inducement against the plaintiff. The defendants assert that the Agreement was executed by Trans-World only in reliance on alleged oral statements by Mr. Stearns to the effect that he would be successful in obtaining an option on the property adjacent to the Rendezvous, which statements Mr. Stearns knew to be false. Trans-World claims that the obtaining of the option was an oral condition of the February 1, 1978, Agreement and that by virtue of the alleged fraud, it is entitled to rescind the contract, restitution of the deposit made into escrow, and punitive damages in the amount of $150,000. The counterclaim asked for attorneys' fees also, but at trial defense counsel conceded that an award of attorneys' fees could only be based on the provisions of the Agreement and would thus be inconsistent with defendant's theory of relief based on rescission of the contract.

Since the property that was the subject of the Agreement giving rise to this action is situated in Nevada, and in view of the fact that most, if not all, of the acts upon which the claims depend occurred in Nevada, the law of the State of Nevada controls the substantive legal issues in this case.

As enunciated by the Nevada Supreme Court, the elements of actionable fraud are:

"A false representation made by the defendant, knowledge or belief on the

part of the defendant that the representation is false—or, that he has not a sufficient basis of information to make it, an intention to induce the plaintiff to act or to refrain from acting in reliance upon the misrepresentation, justifiable reliance upon the representation on the part of the plaintiff in taking action or refraining from it, and damage to the plaintiff, resulting from such reliance  .  .  ." *Sanguinetti v. Strecker*, 94 Nev. 200, 206, 577 P.2d 404, 408 (1978), quoting *Lubbe v. Barba*, 91 Nev. 596, 599, 540 P.2d 115, 117 (1975). A claim of fraud must be established by clear and convincing evidence. See *Lubbe v. Barba*, supra, 91 Nev. at 598, 540 P.2d 115; *Carson Meadows, Inc. v. Pease*, 91 Nev. 187, 192, 533 P.2d 458 (1975); *Clark Sanitation, Inc. v. Sun Valley Disposal Co.*, 87 Nev. 338, 341, 487 P.2d 337 (1971).

■ This Court finds that neither the plaintiff nor the defendant has established its respective claim of fraud by clear and convincing evidence.

As to the plaintiff's fraud claim, even if this Court accepts Mr. Stearns' version of the representations, there is nothing in the record to indicate that Stearns would have acted any differently had the true facts been known. Mr. Stearns testified that Trans-World was represented as having $1.3 million in stockholders' equity and that Mr. Butters was represented as having a personal net worth in excess of $1 million. Mr. Butters' testimony was that he was never directly pressed to reveal his or Trans-World's net worth, but he admitted that he may have made representations as to the size of their assets or their net worth. The only evidence presented on the issue points to a true net worth at the time in question of about three-quarters of a million dollars for both Butters and Trans-World. Stearns apparently did not consider the exact financial position of the defendants to be important enough to demand financial statements or to make bank reference inquiries. This is not a controversy involving parties whose relative bargaining positions were such as would enable one to take undue advantage of the other. Both parties to the Agreement were represented by experienced businessmen. In all such dealings a certain amount of "puffing" is to be expected. In short, the plaintiff has failed to show clearly and convincingly that it justifiably relied on any material misrepresentations by the defendants.

Similarly, this Court finds that the defendants have failed to establish fraud in the inducement by clear and convincing evidence, notwithstanding the testimony of three defense witnesses. Again, the exact nature of the alleged misrepresentations is a matter of some controversy.

■ The parol evidence rule does not apply in this situation. The defendants do not attempt to alter the terms of the Agreement. Rather, defendants seek rescission of the contract on the grounds that it was fraudulently induced. See *Friendly Irishman, Inc. v. Ronnow*, 74 Nev. 316, 330 P.2d 497 (1958).

At trial, Mr. Butters testified that Mr. Stearns had said that he had a "handshake deal" with the president of First Western Savings and Loan Association for an option on the property adjacent to the Rendezvous. This was corroborated by the testimony of Thomas Bell who was Trans-World's attorney during the period of the negotiations. Another attorney's testimony, that of John Boeger, did not go quite so far, but Mr. Boeger did testify that Mr. Stearns said he could obtain an option on the property. Mr. Stearns' testimony, of course, was to the effect that he made no representations over and above the undertaking expressed in paragraph 19 of the Agreement. This Court is inclined to accept Mr. Stearns' version of the controversy simply because the defendants' version flies in the face of what a reasonably prudent businessman would do. Moreover, the version adduced by defendants at trial is materially different from all statements of the claim prior to trial.

Rule 9(b) of the Federal Rules of Civil Procedure requires that "all averments of fraud  .  .  .  be stated with particularity." Defendants had considerable difficulty in meeting this requirement. Defend-

ants' answer and counterclaim, filed March 29, 1978, contained only conclusory allegations to the effect that plaintiff had made "fraudulent material misrepresentations." The amended counterclaim, filed February 2, 1979, alleged that the plaintiff had represented that "it would use best efforts to obtain an option" and that these efforts "would be successful." Even the second amended counterclaim, filed March 19, 1979, after this Court granted plaintiff's motion for a more definite statement, alleged only that the plaintiff represented that it "would be successful in obtaining" an option on the adjacent property. In the first amended pretrial order, filed January 9, 1980, the issue of fact was stated as "whether or not Stearns' Properties, through its general partner, Phillip Stearns, represented that it could obtain an option on the property." And finally, defendants' trial brief, filed only three weeks prior to the commencement of trial, states the claim was based on "oral representations . . . that plaintiff would be successful in obtaining an option to purchase" the adjacent property. Not once in any of the pretrial statements of the claim was there any intimation that Mr. Stearns had said that he had some sort of prearrangement for an option on the adjacent property. The inescapable inference is that the defendants' version presented at trial has benefited somewhat from the power of positive thinking.

Aside from the problem of the pretrial statements, this Court still cannot find that Trans-World could have justifiably relied on any representations to the effect that Stearns would be successful in obtaining an option on the adjacent property. Even ignoring the conceptual problems of fraudulent misrepresentations as to future events, the Court is faced with the unsatisfactorily explained divergence of the language of the Agreement. Trans-World maintains that the acquisition of the adjacent property was absolutely essential to its plans for successful operation of the Rendezvous—so essential, in fact, that Trans-World would not have entered the contract without Stearns' assurance that an option would be obtained. But, on the other hand,

that property was apparently not so essential that the acquisition of such an option would be insisted upon as a condition precedent to the Agreement, at least as it was written. This contradictory position stretches the credulity of this Court beyond reasonable bounds. Finally, a reasonably prudent business person—even one who suffers a momentary lapse into irrationality to sign an Agreement that does not completely express the intent of the parties—would have made independent inquiries as to the availability of the essential adjacent property. There is no evidence that Trans-World could not have done so and had to rely on the representations of Stearns. This Court finds, therefore, that Trans-World did not justifiably rely on any representations the plaintiff may have made regarding anticipated success in obtaining an option on the property. Having failed to establish fraud in the inducement, Trans-World is not entitled to rescind the contract or to any recovery on the counterclaim of fraud.

Trans-World relied exclusively on the allegation of fraud in the inducement as a defense to the breach of contract. This Court having found no fraud in the inducement, the plaintiff's showing of a breach of contract on the part of Trans-World stands unrefuted. This Court finds, therefore, that Trans-World did in fact breach the Agreement to purchase the Rendezvous.

While the original complaint sought to charge Mr. Butters with the breach of contract on the theory that he was and is the alter ego of Trans-World, the alter ego theory has been abandoned. Stearns now concedes that it may recover only against the corporation on the breach of contract claim.

In the determination of the amount of damages recoverable by reason of breach of contract, the law attempts to place the nondefaulting party in the position it would have occupied had the contract been performed. See *LaGrange Construction, Inc. v. Kent Corp.*, 88 Nev. 271, 496 P.2d 766, 768 (1972). But the law recognizes established rules for the measure of damages to be applied in given types of

cases. The Nevada Supreme Court recently stated the following rule for the measure of damages in a case such as that presently before this Court:

"Generally, where the purchaser breaches an executory real estate contract the vendor is entitled to recover damages measured by the difference between the contract price and the market value of the land on the date of the breach."

*Harris v. Shell Development Corp.*, 95 Nev. 94, 594 P.2d 731, 733–34 (1979). The nondefaulting party is also entitled to proved consequential damages, whether or not there is a loss of the benefit of the bargain as measured by the difference between the contract price and the market value of the property on the date of breach. Id., 594 P.2d at 534. Such consequential damages must have been such as would have been within the contemplation of the parties or, stated otherwise, would have been foreseeable consequences of a breach at the making of the contract. See 11 *Williston on Contracts* § 1344 (3d ed. Jaeger). The most typical types of consequential damages are the expenses incurred by the seller in efforts to find another purchaser, which the Nevada Supreme Court has termed "out-of-pocket expenses." See *Harris v. Shell Development Corp.*, supra, 594 P.2d at 734.

■ While it is often said that the non-defaulting party has a duty to mitigate damages, the burden is upon the defaulting party to show that there was a failure to mitigate. See *Dinwiddie Construction Co. v. Campbell*, 81 Nev. 469, 477, 406 P.2d 294 (1965). On the other hand, however, the plaintiff must show both the fact and amount of damage. If a plaintiff fails to establish the amount of damages suffered as a natural and proximate result of the defendant's breach, the defendant is liable only for nominal damages. *Kelly Broadcasting Co. v. Sovereign Broadcast, Inc.*, 606 P.2d 1089, 1092 (Nev.1980); *Alper v. Stillings*, 80 Nev. 84, 86–87, 389 P.2d 239 (1964); *Page v. Walser*, 46 Nev. 390, 408, 213 P. 107 (1923).

In the instant case, Stearns introduced no evidence to prove any damages by reason of loss of benefit of the bargain. The only evidence that tends to show the value of the Rendezvous at the date of the breach is the Agreement between the parties themselves. On the basis of that evidence, the plaintiff would have to be found to have suffered no loss on the bargain, the contract price and the market value being identical. Stearns' trial brief argued that Stearns had suffered a loss on the bargain of $1,026,000, being the total due under the Agreement in addition to the assumption of indebtedness. But there is no evidence tending to show that the value of the property was equal to the amount of the indebtedness that Trans-World agreed to assume.

Any recovery in excess of nominal damages, then, turns upon whether any of the amounts claimed by Stearns are consequential damages. Stearns asked for damages at trial based on the total of the following items: the $474,000 payment due to close the escrow; the $500,000 promissory note to be executed by Trans-World in favor of plaintiff; the $618,000 paid by Stearns on the mortgage and leases through May 1, 1979; and prospective damages to cover the potential liability in the suit brought by MacArthur Leasing Co.

■ All of the claimed items of damage would not have occurred but for the breach by Trans-World. Stearns would have received the cash and the promissory note, would not have had to make the mortgage and lease payments, and Trans-World would have assumed the MacArthur Leasing Co. lease. But damages are not properly assessed by the application of a "but for test." Losses suffered subsequent to a breach are recoverable as consequential damages only to the extent that such losses are the foreseeable and proximate result of the breach.

■ The $474,000 cash and the $500,000 promissory note were clearly part of the purchase price established by the Agreement. As such, these amounts were simply part of the bargained for exchange that never occurred. The only way for a nondefaulting party to recover part of the agreed exchange is to prove that it was a loss of

the benefit of the bargain. As noted previously, there was no proof at trial of any loss on the bargain.

■ This Court finds that the items of claimed damages were not incurred as the natural and proximate result of Trans-World's breach of the Agreement. The contract and subsequent breach by Trans-World did not irrevocably shift to the defendant all possible risks inherent in future dealings with the Rendezvous property. By entering the lease with Big Nickel, Inc., Stearns fixed the limits of Trans-World's liability. Plaintiff did not assert that the lease was only an attempt to mitigate damages while it continued to seek a new buyer. Rather, the only possible inference from the evidence on the record is that Stearns chose to live with the lease without further pursuit of a sale.

■ Moreover, at the point of the lease it is possible to determine the total amount of plaintiff's damage—at least theoretically. The problem here is that there was a failure of proof. The terms of the lease were never introduced into evidence. If they had been, those terms would have provided some basis for expert testimony as to the value of the property at the time of breach for determination of the loss, if any, of the benefit of Stearns' bargain with Trans-World. Trans-World would also be liable for any expenses incurred by Stearns in placing the property back on the market and procuring the lease with Big Nickel, Inc. Evidence was introduced on neither of those two points. Stearns cannot now be heard to complain that it suffered damage attributable to Trans-World by virtue of the fact that the Big Nickel lease did not work out satisfactorily. The execution of that lease created a totally new set of obligations, the consequences of which cannot affect the liability of the defendant, because any losses subsequent to that event are not the proximate result of defendants' breach. Stearns' failure to prove its actual damages by competent evidence does not permit this Court to ignore established rules of law and assess damages on a "but for" theory.

Plaintiff made no attempt to show what amount, if any, of the payments included in the $618,000 paid to Home Savings and MacArthur Leasing, represented payments before the agreement with Big Nickel, Inc. Nor did it attempt to show what portion of any such prelease payments went to interest as opposed to principal on the mortgage. Only such interest payments would be deductible, since plaintiff's transfer from cash holdings or other assets to equity in property cannot be considered a loss, unless the property in question is utterly valueless. Similarly, no evidence suggests that any of Stearns' potential liability to MacArthur Leasing Co., by way of a judgment in the Superior Court of California, represents any liability for failure to meet obligations due prior to the Big Nickel lease agreement.

■ Stearns has failed to show the amount of damages, if any, suffered by reason of Trans-World's breach of the Agreement. Thus, the plaintiff is entitled only to nominal damages in the amount of One Dollar.

■ Stearns Properties is entitled to retain the $52,000 deposited into escrow by Trans-World on February 1, 1978. By the terms of paragraph 6(a) of the Agreement, the parties agreed that the deposit would be forfeited should the escrow fail to close and this amount would constitute a fair rental value for the escrow period, during which time Trans-World had the right to possession of the Rendezvous property.

The foregoing memorandum opinion constitutes this Court's findings of fact and conclusions of law.